Longwoktii, J.
This was an action brought by the plaintiff against defendants, who were mill-owners, to recover damages for flooding her lands, and destroying her crops, by diverting the channel of a stream. The jury, upon the trial, rendered a verdict in favor of defendants; and a motion for a new trial, on the ground that this verdict -was not supported by the evidence, and resulted from erroneous instructions, was overruled, and judgment was rendered on the verdict. This was afterwards affirmed in the district court.
The facts of the case, in so far as I have considered it necessary to report them, are as follows
Prior to 1812, there existed in Erie county, a spring, now called “■ Castalia,” which discharged perennially an extraordinary volume of water, flowing northwardly through the land now owned by the plaintiff, and emptying into Sandusky bay.
About' this time, one Snow, wishing to utilize the waterpower furnished by this spring, built a dam across the'outlet, immediately below its source, and raised the water to a higher level. The result of this increased pressure was, that several years thereafter, the water found, or forced a subterranean channel, breaking out some sixty rods north of the original source, and thence flowing in a new channel to the bay. To maintain the original level of the water, it was found necessary to buildl au embankment around the lower pond, thus raising the -water and obtaining a uniform level in both ponds. This was done.about the year 1822.
Up to 1810, all the water from these ponds ran down-through the old channel through plaintiff’s land as it hadi always done; but in that year, another mill was built at the-lower pond, and a race-vray cut from the latter pond, conveying the water to the ancient channel at a point some distance-below the plaintiff’s land. Through this race-way, all tliewater from the springs has run since 1810, except that there-has always been more or less leakage through the dam at.. th& *520 upper pond, which has passed down the old channel; and on some occasions, when the dam broke away, or when it became necessary to repair the mills, all the water was returned to the old channel. To enable this to be done, a flood-gate, or weir, was at all times maintained, opening from another race-way, which had been cut between the ponds, into the old channel.
In 1812, one Marshall Burton became the owner of these springs, and all the mill property, including the lands now owned by plaintiff ; and through various conveyances, the title to the mill property passed from him to the defendants, and the title to the land now owned by plaintiff, to her.
One of these conveyances from Burton, under which plaintiff acquired an undivided interest, contained the following expressed reservation: “Reserving all water-courses and privileges of excavation for mill or manufacturing purposes at all times.”
In 1875, the defendants, to enable them to repair their mill at the lower pond, opened the flood-gate and turned the water from both ponds into its ancient channel. This channel, by long disuse, had become partially filled up and the 'flooding of plaintiff’s premises resulted, causing the injuries complained of.
This, defendants claim, they had a perfect right to do; among other reasons, because of the reservation in the deed from Burton, above mentioned. It does not appear that in the exercise of the right claimed, the defendants allowed the water to run through the old channel for a longer time than was necessaiy to enable them to repair their mill, or turned into the channel a larger amount of .water, at any time, than would naturally flow there if not restrained by the dam at the upper pond.
It is claimed by the plaintiff that no such right is reserved as against her, for the reason that the deed from Burton in which such reservation is found, conveyed only an wndimded interest, and that, as to the remaining undivided interest, she 'holds her land free from any reservation of such right in Burton’s grantees. ’ She further says that, at the time of the injuries complained of, the channel had been permanently changed ier more than twenty-one years; that defendants had acquired a *521 right by prescription to flow the water through a new channel, which was inconsistent with their right to continue the use of the old; and that she was justified by the condition of things and the acts of the defendants, at the time she purchased, in believing that they had finally abandoned the use of the ancient channel, and that they are, therefore, estopped from asserting such right as against her. This theory of estoppel, we do not think can be maintained. In the first place, the plaintiff knew that the diversion of the stream was for milling purposes only, and that, should the defendants at any time abandon the business of milling, and cease to maintain their dam at the upper pond, the water would inevitably seek again its ancient channel, through which it always had, and always would naturally flow. Such a view would require us to say that the defendants had impliedly bound themselves to forever maintain a dam at the upper pond, and prevent the water from returning to its natural channel. Secondly, the plaintiff knew that defendants had at all times, maintained a flood-gate at the upper dam, the only use of which could be to enable them to return the- water to the old channel, when the repair of their mill, or other cause, should make such a course necessary or advisable. Lastly, the reservation in the deed from Burton, even if it did not operate to secure this right to himself and his grantees, was at least an assertion that he intended to use that water-course thereafter. We are, therefore, unable to see that there was anything in the condition of things, or in the acts of parties, at the time of plaintiff’s purchase, which would justify her in supposing that all use of the ancient channel had been permanently abandoned.
We concede, of course, that the exercise of this right should be reasonable, and that it would be the duty of defendants to so use their own, as not to inflict unnecessary damage or injury upon others; but whether or not they did so act, was a question properly left to the jury, who found upon it in their favor, and the verdict is abundantly supported by the testimony.
In leaving this subject I shall content myself with citing the case of Mason v. Shrewsbury & Hereford R. R. Co., 6 L. R. (Q. B.) 578, which, to my mind, seems directly in point. *522 In that case, a canal company had, under powers granted by act of parliament, diverted a considerable part of the water from a broolc which flowed through plaintiff’s land, at a point above plaintiff’s land, the rest of the water continuing to flow in its natural channel. The canal was disused in 1853; and in 1861, the defendants, who had succeeded to the rights of the canal company, restored to the brook the water which had been diverted from it. The bed of the stream, owing to the diminished flow of water for fifty-three years, had been “ silted up,” and was insufficient to carry off the water coming down in times of extraordinary flood. Such a flood occurred and overflowed plaintiff’s land, damaging his crops. It was held that no right of action existed. In deciding the case, Blackburn, J., said, “ The occupiers of the land, lower down the Ashton brook than the canal, would naturally suppose things were going to remain in the state in which they had been for so many years, and can in no way be blamed for not anticipating that the canal would be disused, and the waters, which had been diverted, again turned into the brook; and, after that state of things had continued for .more than forty yean?, one would wish to find some legal ground for saying that they had acquired a legal right to prevent this long-continued state of things from being altered to their prejudice. But I feel obliged to come to the conclusion that there is no ground on which such a right can be supported.”